IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TVPX ARS INC., as Securities Intermediary for
CONSOLIDATED WEALTH MANAGEMENT,
LLC, on behalf of itself and all others similarly
situated,

        Plaintiff,

v.

                                                    Civil Case No. 3:25cv184

GENWORTH LIFE AND ANNUITY
INSURANCE COMPANY,
        Defendant.

## <u>OPINION</u>

In 2017, the plaintiff, TVPX ARS, Inc. ("TVPX"), acquired a universal life insurance policy issued by the defendant, Genworth Life and Annuity Insurance Co. ("Genworth"). TVPX now claims that Genworth overcharges thousands of people to keep similar policies in force.

Owners pay for universal life insurance through a monthly fee deducted from a cash value attached to each policy. The size of the fee can change each month depending on a complex formula that multiplies a set of relevant numbers by a Cost of Insurance rate ("COI rate"). The COI rates, in turn, change according to expectations of future mortality. In other words, Genworth determines the COI rate by looking to the likelihood that a person in a particular demographic group will die in a given year. So, if Genworth discovers that a demographic has become likelier to die, Genworth can increase the COI rates—and thus the monthly fees—for all people in that group.

The parties now contest whether Genworth has properly assessed COI rates. To TVPX, the assessment is a two-way street: Genworth must increase rates when mortality expectations get worse, but it must also proactively *decrease* rates as expectations improve. TVPX believes

Genworth has not abided by this rule. Despite years of improvement in mortality across demographic groups, Genworth has not lowered rates. Indeed, TVPX says Genworth has *increased* rates. Genworth, however, maintains that its policies create no obligation for it to affirmatively change rates. Further, the insurer says it has not updated its COI rates since 1995 and therefore has not changed rates at all in over thirty years.

To resolve this dispute, TVPX—as a securities intermediary for Consolidated Wealth Management, LLC—filed this class action on March 7, 2025. It brings only one count of breach of contract. Several motions now pend before the Court. Genworth contests TVPX's standing to even bring this suit and moves for judgment on that ground. (ECF No. 84.) TVPX, in turn, has moved to certify a class of thousands of universal life policyholders with similar contractual language. (ECF No. 78.) Genworth has also moved for summary judgment on the merits of the breach claim. (ECF No. 84.) Finally, the parties have filed evidentiary motions in anticipation of trial in this matter. (ECF No. 112, 114, 121, 123, 125).

Because TVPX has standing, the Court will not dismiss this suit on those grounds. Instead, the Court will certify the proposed class under Federal Rule of Civil Procedure 23(b)(3) and grant Genworth's motion for summary judgment. As explained below, Genworth has no affirmative obligation to adjust COI rates as mortality expectations change, nor has it changed COI rates—up or down—in decades. Accordingly, the Court will close the case and deny the other pending motions as moot.

# I. <u>BACKGROUND</u>[1]

## *A. The Universal Life Insurance Policy*

On February 11, 1984, Arlene B. Whitaker[2] purchased a universal life insurance policy[3] from Genworth's predecessor. (Insurance Policy, ECF No. 41-1, at 3, 9.) The policy insured her husband, Lucius M. Whitaker, Jr. (*See id.* at 9.) In its broadest strokes, this policy works like most other life insurance policies: The policyholder provides money, and the insurance company pays out a benefit upon the insured's death or the policy's maturity. (*See id.* at 12.)

Still, a universal life insurance policy has a few exceptional features relevant to this case. First, a universal policy has a "cash value." (*Id.*) In other words, the policy has attached to it a pot of money[4] which accrues interest and which the owner can withdraw from or add funds to. (*Id.* at 15.) This cash value leads to a second relevant difference: The policyholder does not have to pay a monthly insurance premium. Rather, the insurance company deducts a monthly fee from the cash value.[5] Failure to have enough cash value to cover this monthly charge can result in the termination of the policy "without value." (*Id.* at 14, 16.)

---

[1] The page number in any record citation refers to the page number assigned by the Court's electronic docket filing system.

[2] At least one document spells Mrs. Whitaker's name as "Arline B. Whitaker." (*See* Life Settlement Application, ECF No. 85-7.) This Opinion uses "Arlene" to match the spelling in Genworth's paperwork.

[3] The contractual language refers to this type of insurance policy as "a *flexible premium adjustable life insurance policy.*" (ECF No. 41-1, at 12 (emphasis in original).) This Opinion uses that contractual language and "universal life insurance policy" interchangeably.

[4] The insured must make an initial deposit of money to fund the cash value. The policy refers to this initial deposit as an "initial premium." (*Id.* at 14.)

[5] (*See id.* at 14, 16.) To be clear, the Whitakers' policy allows policyholders to pay premiums "annually, semi-annually[,] or quarterly." (*Id.* at 14.) Further, the policyholder could

3

The monthly "cost of insurance" is not a flat fee. (*Id.* at 16.) Instead, the insurer uses a formula to calculate a new charge each month: First, the insurer multiplies the "life insurance proceeds"[6] by 1.0032737. (*Id.*) Next, the insurer takes that product and subtracts from it the "cash value" of the policy. (*Id.*) The insurer then takes the difference of the multiplied number and cash value, and divides that value by 1000. (*Id.*) Crucially, the insurer then takes the newly divided number and multiplies it by a factor called the "Cost of Insurance Rate." One can write this formula as follows:

$$\frac{((\textit{Life insurance proceeds} \times 1.0032737) - \textit{Cash value})}{1000} \times \textit{Cost of Insurance Rate} = \textit{Monthly Cost of Insurance}$$

The present case concerns one factor in this equation: the COI rate. (*See* Am. Compl., ECF No. 41 ¶ 60 (alleging breach by failure to properly calculate cost of insurance rates).) The Whitaker policy, like many of Genworth's policies, contains a provision addressing how the insurer arrives at the COI rate:

> *Cost of Insurance Rate.* The monthly rate is based on the insured's sex, attained age, policy duration and risk class. The rates are determined by us according to expectations of future mortality. We can change the rates from time to time, but they will never be more than the maximum rates shown in the *Table of Guaranteed Maximum Insurance Rates.* A change in rates will apply to all persons of the same age, sex [,] and risk class and whose policies have been in effect for the same length of time.

(ECF No. 41-1, at 16 (emphasis in original).)

In other words, the monthly fee that keeps the universal life insurance policy in force depends, in part, on COI rates. In fact, the monthly fee increases as the COI rate increases. These

---

pay additional premiums "at any time." (*Id.* at 14.) The insurer would then add these additional premiums into the policy's cash value. (*Id.* at 16.)

[6] "Life insurance proceeds" refers to the amount of money "payable at the death of the insured." (*Id.* at 14.)

4

rates "can change," but "are determined . . . according to expectations of future morality."[7] Despite the possibility of change, the maximum rates will not exceed those in the Table of Guaranteed Maximum Insurance Rates (the "Table"). (ECF No. 41-1, at 16.) In 1984, the Table listed COI rates that increased depending on the insured's age. (ECF No. 41-1, at 10–11.) For example, the maximum COI rate was .762940 when Lucius Whitaker was fifty-one, but the maximum rate would rise to 20.102820 when he turned eighty-nine. (*Id.*)

In 1995, Genworth updated the Table.[8] Since then, Genworth has not changed the Table further. (*Id.*) Still, even under the current Table, the COI rate increases as the insured ages. (Zail Report, ECF No. 102-6 ¶ 72.) The Whitaker policy would have had a maximum COI rate of 9.796 in 2016 and a maximum rate of 16.633 in 2022. (*Id.*)

### B. Georgia Class Action Settlement

In 2000, Mrs. Whitaker's policy became involved in a separate class action. Another policyholder filed a class action "against Genworth, then known as Life Insurance Company of Virginia, over the administration and marketing of its universal life insurance policies." *TVPX ARS, Inc. v. Genworth Life and Annuity Ins. Co.* [hereinafter *TVPX II*], 959 F.3d 1318, 1322 (11th Cir. 2020) (citing Compl., *McBride v. Life Ins. Co. of Va.*, No. 4:00cv217, 2019 WL 6001566 (M.D. Ga. Mar. 15, 2019)). The allegations included claims concerning "an increased cost of insurance to cash value as policy holders grew older over time." *Id.*

The Middle District of Georgia approved a class settlement for that action in 2004. *Id.* The class members agreed to release the insurer from any causes of action related to the case's

---

[7] (*Id.*) According to TVPX, "expectations of future mortality" refers to "the probability that the insured will die in a particular policy year." (Am. Compl., ECF No. 41 ¶ 4.)

[8] (*See* Jaso Dep., ECF No. 85-5, at 247:5–14; TVPX Appellate Br., ECF No. 20-1, at 3.)

underlying claims and "were precluded" from bringing claims relating to certain actions Genworth took regarding COI rates. *Id.*

### C. Transfer of Policy's Record Title to TVPX

At the time of the 2004 settlement, Arlene Whitaker still owned the policy at issue here. In June 2017, Mrs. Whitaker finally sold the policy, including "all rights that may be exercised by [her]," to a company, Life Equity, LLC. (Life Settlement Agreement, ECF No. 102-8, at 1.) In August of 2017, another company—Consolidated Wealth Management Ltd. ("CWM Ltd.")—purchased the policy. (Policy Assignment Agreement, ECF No. 85-10, at 2.) That same month, CWM Ltd. entered a securities intermediary agreement with TVPX. (*See* Securities Intermediary and Custodian Agreement, ECF No. 102-11.)

Under the terms of that agreement, TVPX serves as a securities intermediary. In other words, TVPX holds "record legal title" to the policy and is the policy's beneficiary. (*Id.* at 2.) TVPX also takes on administrative tasks associated with the policy, such as forwarding notices (*Id.* at 2–3.) It also "pa[ys] premiums" on the policy from its own funds. (ECF No. 102, at 12.) Further, the securities intermediary agreement provides that TVPX would promptly "deliver" the death benefit to CWM Ltd. upon receiving it from Genworth. (ECF No. 102-11, at 3; *see* Genworth's Death Benefit Check to TVPX, ECF No. 102-12, at 2.) In exchange for all this, TVPX receives reimbursements, fees, and other consideration. (ECF No. 102-11, at 2, 11.)

For years, TVPX paid premiums on the policy. (*See, e.g.,* TVPX's Premium Check to Genworth, ECF No. 102-10.)

### D. TVPX's First Lawsuit

On September 29, 2018, TVPX filed a class action in this District. *See TVPX ARS, Inc. v. Genworth Life and Annuity Ins. Co.*, No. 3:18cv637 (E.D. Va. 2018). TVPX brought the suit as a

6

securities intermediary for CWM Ltd. and lodged an almost identical claim to the current suit's: that Genworth breached its insurance agreement by failing to adjust COI rates consistently with mortality expectations. (Amend. Compl., No. 3:18cv637 (E.D. Va. 2018), ECF No. 39 ¶¶ 46–48.)

Genworth believed that the 2004 class action settlement barred the 2018 suit, so the insurer filed a motion to enforce the 2004 settlement in the Middle District of Georgia. *TVPX II*, 959 F.3d at 1324. The Georgia court granted Genworth's enforcement motion, finding that the insurer had not altered its COI rate practices since the 2004 settlement. *Id.* This Court then dismissed the Virginia class action without prejudice. (Order, No. 3:18cv637 (E.D. Va. 2018), ECF No. 48.)

On May 26, 2020, the U.S. Court of Appeals for the Eleventh Circuit remanded the Georgia order for further fact finding. *TVPX II*, 959 F.3d at 1329–30. On remand, the district court ultimately denied the motion to enforce because the Virginia suit did *not* arise from the same factual predicate as the earlier class action. *TVPX ARS, Inc. v. Genworth Life and Annuity Ins. Co.*, 2022 WL 884263, at *3 (M.D. Ga. Mar. 24, 2022). Genworth appealed the denial.

While the second Georgia appeal pended, CWM Ltd.—on whose behalf TVPX had brought the 2018 suit—filed for bankruptcy on April 6, 2022. (*See* Bankruptcy Plan, ECF No. 102-13, at 6, 12, 17.) That May, CWM Ltd. entered a bankruptcy plan with at least three relevant provisions: First, CWM Ltd. was reorganized into Consolidated Wealth Management, *LLC.* (*Id.* at 26.) Second, CWM, LLC, retained the cause of action brought in the 2018 Virginia suit. (Plan Suppl., ECF No. 102-15, at 217.) Finally, the bankrupt CWM Ltd. transferred all of its life insurance policies to an entirely different third party, Life Opportunity Fund II, L.P. (ECF No. 102-13, at 5, 27.)

Three years after the bankruptcy, the Eleventh Circuit affirmed the finding that the 2004 settlement did not bar the 2018 suit. *McBride v. Genworth Life and Annuity Ins. Co.*, No. 22-11185, 2025 WL 48105, at *2 (11th Cir. Jan. 8, 2025).

### E. Current Suit

Without the 2004 agreement barring its claim, TVPX filed the instant action on March 7, 2025. (ECF No. 1.) Similarly to the 2018 suit, TVPX alleges that Genworth has breached the Whitaker insurance policy (and policies with identical language) by failing to tie COI rates to mortality expectations—and by failing to adjust rates downward because expectations of future mortality have improved for all class members. (ECF No. 41 ¶¶ 58–63.) Unlike in the 2018 suit, TVPX brings this class action as the securities intermediary for CWM, LLC—not CWM Ltd. (*Id.* ¶ 15.)

## II. STANDING

Federal courts have jurisdiction only over genuine "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. A constitutionally real case requires that a plaintiff "have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "Standing" refers to a plaintiff's "personal stake in the outcome of" a case. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted). A plaintiff must demonstrate such a stake by showing "(1) an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable judicial decision." *LaFave v. Cnty. of Fairfax*, 149 F.4th 476, 484–85 (4th Cir. 2025) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)) (cleaned up).

Here, TVPX has Article III standing. Relying on disputed cost of insurance rates, TVPX alleges Genworth withdrew an excess of $78,220.13[9] from the cash value of a policy TVPX owned. (*See* Mills Rep., ECF No. 82 ¶ 18.) An entity that suffers a "past monetary loss" suffers "a quintessential injury in fact." *Penegar v. Liberty Mut. Ins. Co.*, 115 F.4th 294, 302 (4th Cir. 2024) (citation omitted). Further, TVPX can trace this harm to Genworth's decision to withdraw the funds based, in part, on a particular COI rate. Finally, "there exists a non-speculative likelihood that the alleged injury would be redressed by a favorable judicial decision" because the Court may award damages if TVPX succeeds. *Justice 360 v. Stirling*, 42 F.4th 450, 459 (4th Cir. 2022) (cleaned up). The case, therefore, remains justiciable by this Court.

None of Genworth's arguments against TVPX's standing succeed. First, the defendant claims TVPX itself suffered no injury because, as a securities intermediary, it was not the "real economic owner" who would bear loss. (ECF No. 108, at 9.) But TVPX itself *did* suffer a cognizable injury. It owned the Whitaker policy and paid premiums on it—and, therefore, it suffered economic loss when Genworth withdrew money from the cash value, or when TVPX overpaid on premiums. (*See* No. 102-11; ECF No. 102-10.) This suffices for Article III cognizable injury. *See, e.g., Advance Tr. & Life Escrow Servs., LTA v. Sec. Life of Denver Ins. Co.*, No. 1:18cv1897, 2020 WL 8186476, at *3 (D. Colo. Apr. 13, 2020) (finding a securities intermediary had a "personal stake" and "particularized injury"). And even if TVPX must turn over its damages

---

[9] The parties dispute how to calculate damages and whether damages occurred at all. Indeed, one of Genworth's experts suggests that a corrected version of TVPX's theory of damages should lead to a lower loss calculation of "$41,601." (Pfeifer Report, ECF No. 115-2 ¶ 96.) The precise amount of monetary loss, however, does not matter for standing purposes. TVPX has offered some evidence beyond the pleadings showing a loss greater than zero. At the summary judgment stage, this evidence establishes standing. *Lujan*, 504 U.S. at 561 (citing Fed. R. Civ. P. 56(e)) (describing the evidentiary standard for standing at summary judgment).

to another entity, the standing inquiry does not depend "on what the plaintiff ultimately intends to do with the money [it] recovers." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (citations omitted)).

Next, Genworth says that TVPX fails to sue on behalf of the real economic owner because (a) it "cannot prove that it was ever the securities intermediary for CWM, *LLC*," and (b) CWM, LLC, never had ownership in the Whittaker policy. (ECF No. 108, at 7 (emphasis added).) This argument fails for a similar reason—TVPX as nominal owner and beneficiary has an economic stake in the case. Such a stake alone confers standing.

Genworth's assignment arguments also miss the mark. A party validly assigns contractual rights when the party intends to assign the right and when "[t]he subject matter of an assignment is sufficiently identified" through "such particularity as to render it capable of identification." *Liberty Trans., Inc. v. Mass. Bay Ins. Co.*, 189 Conn. App. 595, 603, 208 A.3d 330, 337–38 (2019). When Arlene Whitaker sold her policy in 2017, she assigned "all rights that may be exercised by the owner of the Policy." (ECF No. 102-8, at 1.) By using the expansive word "all," Mrs. Whitaker clearly identified her intent to assign her right to bring any claim accrued during her time as the policy's owner. Accordingly, Whitaker's right to sue prior to 2017 passed through the chain of title to TVPX when it received ownership of the policy at issue.

Finally, TVPX has standing to bring claims after August 30, 2022. Genworth claims otherwise because CWM, LLC's interest in the policy and any litigation rights allegedly went to another entity on August 30, 2022, through a bankruptcy plan. Under Genworth's theory, this other entity must assign TVPX the right to bring this action. (*See* ECF No. 108, at 13–15.) But this errs for a similar reason discussed above: The intermediary agreement made TVPX the owner, beneficiary, and premium payer of the policy. Whether TVPX (or CWM, LLC, for that matter)

must redirect any money to another entity does not matter because TVPX suffered an injury. Whether an agreement between TVPX and another entity requires TVPX to pass along damages does not matter for standing purposes. *See Sprint*, 554 U.S. at 2.

### III. CLASS CERTIFICATION

Pursuant to Federal Rule of Civil Procedure 23(b)(3), TVPX asks the Court to certify the following class:

> **COI Overcharge Class**. All owners of universal life (including variable universal life) insurance policies issued or insured by Genworth Life and Annuity Insurance Company, or its predecessors, that provide that cost of insurance rates are determined according to expectations of future mortality, and that were charged for the cost of insurance on or after the start of the Class Period.[10]

Genworth argues that individualized issues will overrun the litigation. The Court, however, disagrees and will certify the class pursuant to Rule 23(b)(3).

---

[10] (ECF No. 78, at 1 (emphasis in original).) TVPX notes that the proposed class does *not* include:

- Genworth, its officers and directors, members of their immediate families, and the heirs, successors, or assigns of any of the foregoing; anyone employed with TVPX's counsel's firms; any Judge to whom this case is assigned, and his or her immediate family; and

- Policies issued in Alaska, Hawaii, Nevada, New York, South Carolina, Vermont, and Wyoming; and

- Policies with the following plan codes: 103A83, 103B83, 107580, 107681, 115A85, 1A7682, 1A7683, 1B7682, 1B7683, 1E7682, 1E7683, 1F7682, 1F7683, 1T7581, and 1T7681.

(*Id.*)

TVPX defines the "Class Period" depending on the state in which a policy was issued. (*Id.*) For policies issued in Colorado, Delaware, Maryland, New Hampshire, North Carolina, and Washington, D.C., the Class Period runs from September 19, 2015, to the date of final judgment. (*Id.* at 2.) For policies issued in California, Pennsylvania, and Texas, the Class Period runs from September 19, 2014, to final judgment. (*Id.*) For the remaining states, the Class Period runs from September 19, 2013, to final judgment. (*Id.*)

11

### A. Class Action Standard

The class action "is an exception to the general rule that a party . . . may vindicate only his own interests." *Thorn v. Jefferson Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006) (citation omitted). When many potential litigants share a stake in the litigation, the law allows "a representative party to prosecute his own claims and the claims of those who present similar issues" in one suit. *Id.* (citation omitted). Because named plaintiffs can bind the rights of many absent class members at defendants' great expense, a class action may proceed only when it adheres to the rigorous requirements of Federal Rule of Civil Procedure 23. *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011).

Rule 23 allows a suit to proceed if it (a) satisfies four enumerated prerequisites and (b) falls into a category of lawsuit for which a group remedy most efficiently resolves the alleged harm. *See* Fed. R. Civ. P. 23(a), (b). Rule 23(a)'s four perquisites follow: (1) A group so numerous that joinder is impracticable; (2) questions of fact or law common to the class; (3) a named plaintiff with claims or defenses typical of the class; and (4) a class representative who can fairly and adequately represent the absent members' interests. Fed. R. Civ. P 23(a)(1)–(4). Further, the class must fall into a category described in Rule 23(b). Relevant here, Rule 23(b)(3) permits a court to certify a class when common questions of fact and law "predominate over any questions affecting only individual members" and when the class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Finally, the Fourth Circuit requires an implied Rule 23 prerequisite—"ascertainability." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (collecting cases) (citations omitted). "Ascertainability" means "that the members of a proposed class be readily identifiable" through objective criteria. *Id.* (cleaned up) (citations omitted).

12

### *B. Discussion*

#### *1. Rule 23(a) Analysis*

##### *i. Numerosity*

A properly certified class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specific[] number is needed" to satisfy this numerosity requirement. *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) (citation omitted). Rather, "[c]ourts consider a number of factors in considering whether joinder is practicable including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion." *Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 416 (E.D. Va. 2016) (citation omitted). Classes involving thousands usually satisfy this requirement. *Id.*

Here, Genworth does not dispute numerosity, nor could it. The proposed class involves 8,132 policies across the country, so it likely includes thousands of owners who could not easily be joined in one suit without significant administrative hurdles. (ECF No. 82 ¶ 12.) Accordingly, the class satisfies the numerosity requirement.

##### *ii. Commonality*

Under the second Rule 23(a) requirement, a class must share common questions of law or fact. Fed. R. Civ. P. 23(a)(2). "What matters" for this commonality requirement "is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original) (citation omitted). In other words, the class must raise a common problem, the solving of which "will resolve an issue that is central to

the validity of each one the claims in one stroke." *Id.* "A single common question will suffice," so long as it is vital to the claims. *EQT Prod.*, 764 F.3d at 360.

Here, the class raises legal and factual questions central the breach claim. Because the class members own policies bearing uniform language, interpreting the contract will "resolve an issue"—Genworth's contractual duty to change rates—"that is central the validity of each one the claims in one stroke." *Dukes*, 564 U.S. at 350. Further, if the policy obligates Genworth to reassess COI rates according to expectations of future mortality, the Court must then determine whether Genworth used expectations of future mortality to reassess rates. For these reasons, the class satisfies commonality.

### iii. Typicality

Federal Rule of Civil Procedure 23(a)(3) requires a named plaintiff to have claims or defenses "typical of the claims or defenses of the class." A representative plaintiff's claims satisfy this typicality requirement when they "tend to advance the interests of the absent class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). "That is not to say that typicality requires that the plaintiff's claims and the claims of class members be perfectly identical or perfectly aligned. But when the variation in claims strikes at the heart of the respective causes of action," a court should deny the class. *Id.* at 467 (citations omitted).

As explained above, TVPX brings a claim concerning contractual language and practices common to the whole class. The class members, though varying in age, location, or coverage, also have claims that concern whether Genworth needed to and did adjust COI rates. Accordingly, "the evidence proffered to advance the representative's claim"—the language and Genworth's failure to decrease rates—will also "advance the class claim." *Soutter v. Equifax Information Servs., LLC*, 307 F.R.D. 183, 208 (E.D. Va. 2015). TVPX, therefore, brings a claim typical to the class.

14

Genworth offers a bevy of counterarguments, but none defeat typicality.[11]    Most significantly, it claims that an affirmative defense—the voluntary payment doctrine—will require individualized evidence about the state of mind of a sophisticated actor like TVPX.  Under the voluntary payment doctrine, "[a] party cannot recover money voluntarily paid with a full knowledge of all of the facts, although no obligation to make such payment existed." *Morris v. City of New Haven*, 78 Conn. 673, 673, 63 A. 123, 123–24 (1906) (citations omitted).  Because that defense requires courts to peer into a payor's "knowledge of the facts," it may require individualized proof that a sophisticated policyholder like TVPX *knew* that Genworth overcharged COI rates but continued to fund the policy.  *See id.*  Thus, Genworth worries that the parties will overwhelm the litigation with evidence about TVPX's actuarial projections and investment strategies that prove knowledge of the alleged COI rate overcharges.  These complex projections and strategies, according to Genworth, likely do not advance the claims of less sophisticated individual class members.

Generally, "the presence of even an arguable defense peculiar to the named plaintiff . . . may destroy the required typicality." *Shiring v. Tier Tech., Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007) (cleaned up).  In this case, though, TVPX has offered common evidence which may resolve the voluntary payment doctrine dispute without wading into individualized circumstances.  Crucially, TVPX claims that *no* class member made "voluntary payments" which excuse COI overcharges because, under the policy, Genworth *automatically deducted* a monthly charge from a policy's cash value, regardless of the policyholders' actions. (*See* ECF No. 41-1, at 14, 16.)

---

[11] The Court has already addressed two of these arguments:  TVPX has standing, so TVPX is not atypical for lack of standing or injury. *See supra* Part II. Similarly, assignment issues unique to TVPX will not overwhelm the rest of the litigation because the Court has already found that TVPX has the right to bring this claim. *Id.*

*iv. Adequacy*

Adequacy requires that the "representative parties fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). When the named plaintiffs "possess the same interest and suffer the same injury" as other class members, and when the plaintiffs' counsel can ably represent the class, Rule 23(a)(4) is satisfied. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citation omitted). "To defeat the adequacy requirement of Rule 23, a conflict [of interest] must be" "fundamental" and "go to the heart of their roles as class representatives." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430–31 (4th Cir. 2003) (cleaned up) (citation omitted).

Genworth contends that TVPX lacks the same incentives as the other plaintiffs because it suffered no injury and faces unique issues that "will dominate the litigation." (ECF No. 98, at 25.) But the Court has already found that TVPX suffered an injury. Like all class members, TVPX purportedly suffered loss through overcharges to its cash value. Accordingly, it has suffered the "same injury" and possesses the same interest in recovery as absent class members. *See Amchem*, 521 U.S. at 625. Further, the Court has already resolved other TVPX-specific issues like assignment and standing. *See* Part II. These issues, then, run little risk of overrunning the litigation.

### 2. *Rule 23(b)(3) Analysis*

The Court now turns to the two 23(b)(3) requirements—predominance and superiority. The Court finds both satisfied.

*i. Predominance*

"The predominance requirement is similar to but 'more stringent' than the commonality requirement of Rule 23(a)." *Thorn*, 445 F.3d at 319 (citation omitted). Whereas commonality

16

looks to the mere existence of common issues, the more rigorous criterion requires "that the questions of law or fact common to the class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Common questions predominate when they "are more prevalent or important than the non-common, aggregation-defeating individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). Ultimately, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623 (citation omitted).

Common questions tend to predominate when the class's allegations involve "standardized, uniform written documents" because the same evidence supports the interpretation of the contract.[12] Indeed, many other courts have found that "matching policy language provided the necessary commonality, which predominated over other issues" in similar COI rate litigation. *See, e.g., Meek v. Kan. City Life Ins. Co.*, 126 F.4th 577, 584 (8th Cir. 2025).

Here, the parties raise at least two disputes at the heart of liability: (1) whether Genworth's form language obligates it to adjust COI rates consistently with changes in expectations of future mortality, and (2) whether Genworth has changed rates despite not changing the Table since 1995. Because the class involves the same language and the same Table, the resolution of the parties' dispute will turn on an interpretation and evidence common to all class members. (*See* ECF No. 78, at 1–2 (defining the class).) Accordingly, the common issues in this case predominate.

Genworth raises four unsuccessful arguments against this conclusion. First, it says that that damages will so vary between class members that individual questions will overrun the

---

[12] *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 325, 333 (D.S.C. 1991); *see also In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 155 (D.S.C. 2018) ("[T]he common issue that predominates . . . is whether [an overdraft] was permissible under the Bank's materially uniform contract.").

common questions. Second, Genworth claims that mortality assumptions depend on individual members' circumstances, again leading to a series of mini-trials. Third, the insurer raises an affirmative defense which requires individualized adjudications into each class member's state of mind—a process that will apparently overwhelm the common questions. Finally, Genworth argues that variations in state contract law will prevent efficient analysis of common questions.

### a. Individualized Damages Inquiry

Genworth argues that damages turn on individualized inquiries that defeat predominance because no injury occurs by a simple overcharge. (ECF No. 98, at 15.) Instead, Genworth believes that the Court can only measure an alleged injury through "dollars paid or received" under the policy. (*Id.* at 14.) In other words, economic harm does not happen just because the insurer overcharges one's account: Instead, a harm occurs when a policyholder receives a smaller death benefit due to the overcharge, or when a person pays more money than she otherwise would have due to the overcharge. Because class members' individualized choices determine the amount of money paid into the account or received at death, Genworth believes damages will turn on these individualized choices—not on a common damages formula.[13]

_____

[13] To be clear, the insurer's argument allows *some* harm to arise from a miscalculated monthly charge. For example, if Genworth took the entirety of a policyholder's cash value by overcharging the monthly cost of insurance, then the policyholder must pay an out-of-pocket premium to keep the policy in force. (*See id.*) Genworth agrees this out-of-pocket expense is a harm that occurs, in part, due to an overcharge. (*See id.* at 15.) In another example, some policyholders choose an "increasing" policy in which the death benefit includes a lump sum *on top of* the policy's cash value. If Genworth overcharges the cash value of an increasing policy, the beneficiary ultimately receives a smaller amount in proceeds because the insurer wrongfully depleted the cash value. (*See id.*)

Genworth, however, argues that policyholders' choices might result in no harm at all. On its view, only some premiums may cause harm. Many policyholders "pay premiums according to a consistent funding strategy," so one cannot tell whether a policyholder paid a premium in response to overcharges or for investment reasons. (*Id.*) Further, Genworth points to some policyholders with "level" policies. Under a "level" policy, the death proceeds are the higher of a

This argument fails. True, the economic harm may feel particularly acute when the insured pays a premium to cover an overcharge or when a beneficiary receives a smaller death benefit—but the harm occurred at overcharge. As other courts have recognized, "[e]ven policies that have been paid in full may have suffered damage to their account values *by paying excess COI charges.*" *See Advance Tr. & Life Escrow Servs., LTA v. ReliaStar Life Ins. Co.*, No. 18-2863, 2022 WL 911739, at *13 (D. Minn. Mar. 29, 2022) (citations omitted) (emphasis added). This makes sense: Each policy has a cash value attached, and an overcharge depletes that value in a way the parties did not agree to. This is an economic detriment to the account.

Accordingly, Genworth's argument fails.[14]

### b. Variations in Mortality Expectations

The insurer also claims that TVPX's approach to damages "assumes COI would change monolithically—when in fact mortality expectations (and thus COI under TVPX's theory) differ across age, gender, and other demographic and risk categories." (ECF No. 98, at 15–16.) On this

---

lump sum or the cash value. (*Id.* at 13.) Genworth argues that "level" policyholders may never experience harm: If they received their lump-sum death benefit and never paid additional premiums, they have little to prove that "the alleged COI differential caused the policyholder to pay more out of pocket or receive less at death." (*Id.* at 14.)

To sum up Genworth's position, the cost of insurance deduction is not itself an economic harm. Economic harm *might* occur on the payment of a smaller death benefit, or on the deposit of a premium, or on the withdrawal of cash, or on any number of individual choices. According to this view, individual damages issues defeat the efficiencies of the class action.

[14] Genworth claims that its predominance arguments demonstrate standing issues in the proposed class. (ECF No. 98, at 14.) In fact, Genworth's experts estimate that "2,622 of the 8,132 policies" at issue might lack standing because they require individualized proof as to damages. (*Id.*) The Court, however, finds standing because each class member suffered an injury through an overcharge.

view, the Court cannot determine a "single common" effect that changing mortality expectations would have on the class. (*Id.* at 16.)

When "[q]uestions of individual damage calculation . . . overwhelm questions common to the class," they defeat predominance. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). "This does not mean, however, that damages must be 'susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 237 (4th Cir. 2021) (citation omitted). Rather, it means that named plaintiffs must at least "identify a theory of class-wide damages tied to their theory of liability to support class certification." *Spurlock v. Wexford Health Sources, Inc.*, 175 F.4th 232, 249 (4th Cir. 2026) (citing *Comcast Corp.*, 569 U.S. at 35). If the plaintiffs' theories of damages diverge too far from their theory of liability, then predominance fails. *Id.*

TVPX offers a damages model tied to its class-wide theory of liability. (*See* ECF No. 82 ¶¶ 13–18.) The model attempts to calculate damages by applying lower COI rates based on improved mortality expectations. (ECF No. 82-1 ¶¶ 93–128, 137.) This approach ties to TVPX's contention that Genworth breached by failing to lower COI rates as mortality expectations got better. Further, TVPX's damages model already purports to account for changes across age, sex, and other relevant criteria across the class.[15]   This supports a finding of predominance.

### c. Affirmative Defense

Genworth further argues that the voluntary payment doctrine precludes class certification. As courts usually state that doctrine, a plaintiff cannot recover money voluntarily paid to another when the plaintiff had no obligation to make that payment and had full knowledge of the facts. *See, e.g., Morris*, 78 Conn. at 673, 63 A. at 123–24 (citations omitted). Even though application

---

[15] (*Id.* ¶¶ 105, 110; ECF No. 82 ¶¶ 13, 17.)

of this doctrine may turn on individual class members' knowledge, "[i]t is not the law that any time a voluntary payment doctrine issue is raised that certification must be denied."[16] Rather, the voluntary payment doctrine defeats predominance only by showing that "the evidence . . . differ[s] from class member to class member." *Ford v. Veterans Guardian VA Claim Consulting, LLC*, 1:23-CV-756, 2025 WL 3764749, at *7 (M.D.N.C. Dec. 30, 2025).

Here, the Court finds that some common evidence may resolve the voluntary payment doctrine dispute. For example, common evidence might show that no policyholder made voluntary payments. After all, under the policy, Genworth automatically deducted a monthly charge from a policy's cash value, regardless of the policyholders' actions. (*See* ECF No. 41-1, at 14, 16.) In fact, the Court will explain below that Genworth's voluntary payment doctrine argument fails for just that reason, solving any problem of individualized proof. *See infra* Part IV.A.

#### d. Variations in State Contract Law

"In a class action potentially governed by the laws of multiple states, . . . 'variations in state law may swamp any common issues and defeat predominance.'" *Ward v. Dixie Nat'l Life Ins. Co.*, 257 F. App'x 620, 628–29 (4th Cir. 2007) (citation omitted). To carry the burden of class certification, a representative plaintiff must at least "identify and compare the applicable state laws" to show whether any variations pose significant hurdles. *Id.* at 629. TVPX's state-by-state analysis demonstrates that states vary in their approaches to ambiguity and extrinsic evidence in contract interpretation. (*See* ECF No. 81 at 29–30.)   Genworth claims these differences render the class unmanageable.

---

[16] *Whitton v. Deffenbaugh Disposal, Inc.*, No. 12-2247, 2014 WL 11485715, at *7 (D. Kan. Oct. 28, 2014) (quoting *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 45 (E.D.N.Y. 2008)); *see also In re TD Bank*, 325 F.R.D. at 170–72 (discussing the voluntary payment doctrine).

21

Despite the differences in state law, the Court has a framework with which it can easily manage variations. TVPX's survey highlights differences in states' approaches to contract interpretation and groups together similar state approaches. When a party provides "state law surveys that appear to accurately summarize the relevant states' breach of contract and contract interpretation laws and have divided the states into groups based" on similarity, the Court can look to that survey to avoid any pitfalls. *Handorf v. Transamerica Life Ins. Co.*, 349 F.R.D. 540, 555 (N.D. Iowa 2025). Indeed, at least three courts have found that such surveys do not defeat predominance in other COI rate litigation.[17]

An overview of TVPX's survey shows how the Court can group and manage the different state laws: All forty-four relevant jurisdictions interpret contracts in two stages. (*See* Surveys, ECF Nos. 78-11, 78-12, 78-14.) In the first, a court determines whether a contract is ambiguous, and if the contract is unclear, the court reaches the second stage, in which it resolves an ambiguity. (*See id.*)

At stage one, jurisdictions allow different evidence to determine the ambiguity of a contract. Thirty-five look only to the "four corners" of the contract itself to determine whether ambiguity exists. (ECF No. 78-12, at 2–12.) Five states, however, look both to the contractual language and the circumstances of the contract's formation. (*Id.* at 12–17.) Further, four states look to contractual language, formation evidence, and other objective evidence, including the parties' post-formation course of performance. (*Id.* at 18–20.) Notably, all jurisdictions at this stage permit the use of dictionary evidence to determine plain meaning. (ECF No. 78-13.)

In stage two, jurisdictions treat ambiguities in insurance contracts differently. Eight states automatically construe ambiguous insurance contracts against the insurer. (ECF No. 78-14, at 2–

---

[17] *See id.*; *ReliaStar*, 2022 WL 911739, at *12; *Sec. Life of Denver*, 2021 WL 62339, at *9.

5.) In thirteen jurisdictions, a trier of fact may construe against the insurer *only after* looking to extrinsic evidence that might resolve an ambiguity. (*Id.* at 15–19.) The remaining twenty-three states look to extrinsic evidence and construe against the insurer, but they do not specify an exact order in which courts may do so. (*Id.* at 6–15.)

These differences do not create such a sticky morass that the Court cannot efficiently work through them. Indeed, TVPX's survey has done most of the heavy lifting in identifying the state laws. This Court, like others before it, therefore finds the class manageable even with slight state-law variations.

### ii. Superiority

Superiority tests whether the class action provides a fairer and more efficient form of litigation than other available methods. Fed. R. Civ. P. 23(b)(3). A determination of fairness and efficiency "depends greatly on the circumstances surrounding each case" and the possible alternative avenues for adjudication. *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010) (citation omitted). Still, when assessing superiority, courts should at least consider (A) class members' interest in controlling separate actions; (B) previous litigation started by class members concerning the instant controversy; (C) the desirability of litigating in a particular forum; and (D) the likely difficulties of managing the class. Fed. R. Civ. P. 23(b)(3).

In this case, a class action proves the most efficient and fairest form of adjudication. Given the complexity of the actuarial issues and uncertainty of recovery, "there is no indication . . . the class members would have a strong interest in individual litigation." *Stillmock*, 385 F. App'x at 274. Further, certification "promotes consistency of results, giving defendants the finality and repose." *Gunnells*, 348 F.3d at 427. Further, none of the other 23(b)(3) factors counsel against a

23

finding of superiority. Accordingly, this class action provides an efficient mechanism that serves the interests of both the class and the defendant.

Genworth attempts to resist this by reasserting its arguments about individualized damages, defenses, and differences in state law. (ECF No. 98, at 19.) Because it has already addressed those arguments and found them unpersuasive, the Court still finds superiority satisfied.

### 3. *Ascertainability*

The Fourth Circuit requires certain classes to be ascertainable. *See EQT Prod.*, 764 F.3d at 358. "Ascertainability" means "that the members of a proposed class be 'readily identifiable'" through objective criteria. *Id.* (citations omitted). In analyzing ascertainability, a court tries "not to identify every class member at the time of certification, but to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019) (quoting *EQT Prod.*, 764 F.3d at 358) (alteration in original).

The class definition provides an administratively feasible way for Genworth to examine its records for class members: It identifies particular language unique to class members' policies. (ECF No. 78, at 1.) Further, TVPX provided a long list of exclusions that help narrow which policies fall into and out of the class. (*Id.*) Accordingly, the class definition provides a useful metric through which one can determine whether a policy falls into the class.

For all the reasons explained above, the Court will grant the motion for class certification.

### IV. **SUMMARY JUDGMENT**

The Court now considers whether to grant summary judgment. Under TVPX's theory, Genworth had a contractual duty to proactively adjust COI rates whenever expectations of future mortality changed, but since 2013, the insurer *increased* rates despite mortality improvements.

24

Genworth finds three problems with TVPX's theory: First, Genworth argues that the insurance policy does not obligate it to adjust COI rates—though it grants the insurer discretion to do so. Second, Genworth believes that, under the terms of the contract, it has not adjusted COI rates—up or down—since 1995. Finally, Genworth claims that TVPX cannot recover any cost of insurance charges under Connecticut's voluntary payment doctrine.

Genworth fails on the voluntary payment doctrine, but correctly interprets the underlying contract. The relevant policy language merely gives the insurer discretion to change rates in accord with future expectations of mortality *if it chooses to change rates at all*. But it does not *obligate* any change. Further, Genworth has not changed its COI rates because it has not altered the Table since 1995. Accordingly, Genworth has not breached the insurance policy, so the Court will grant summary judgment in its favor.

### A. Voluntary Payment Doctrine

Under Connecticut's voluntary payment doctrine,[18] "[a] party cannot recover money voluntarily paid with a full knowledge of all the facts, although no obligation to make such a payment existed." *Morris*, 78 Conn. at 673, 63 A. at 123–24 (citations omitted). "A payment is voluntary if made by a party informed of all the facts connected with the subject-matter of the payment, and under the influence of no distress or coercion, even though accompanied with a protest." *Id.* at 78 Conn. at 675–76, 63 A. at 124 (citations omitted). The defendant must prove all the elements of this affirmative defense, including that the plaintiff acted intentionally.

---

[18] In diversity jurisdiction cases, federal courts apply the choice-of-law rules of the state in which they sit. *Koppers Performance Chems., Inc. v. Argonaut-Midwest Ins. Co.*, 105 F.4th 635, 640 n.4 (4th Cir. 2024) (citation omitted). In Virginia, "the law of the place where an insurance contract is written and delivered controls issues as to its coverage." *Buchanan v. Doe*, 246 Va. 67, 70–71, 431 S.E.2d 289, 291 (1993) (citation omitted). Because the relevant contract was delivered in Connecticut, (*see* ECF No. 41-1, at 4), Connecticut law applies to this analysis.

*Kennynick, LLC v. Standard Petroleum Co.*, 222 Conn. App. 234, 257, 305 A.3d 632, 649–50 (2023) (rejecting the application of the doctrine for defendant's failure to offer proof of knowledge).

The voluntary payment doctrine does not apply here. Because the disputed payment—the monthly cost of insurance charge—consisted of a *deduction made by Genworth*, TVPX made no "intentional acts" to pay COI charges. *See Kennynick*, 222 Conn. App. at 257, 305 A.3d at 650. Genworth tries to avoid this conclusion by pointing to the fact that Genworth made voluntary premium charges to keep the policy in force. But the "[p]laintiff does not challenge the amount of the premium [it] paid, only the costs deducted from [its] and class member account values, a practice that does not involve any voluntary conduct by [policyholders]."[19]   Accordingly, the voluntary payment doctrine cannot bar TVPX from recovering the value of a deduction it did not make.

### B. Contractual Interpretation

The Court now interprets the parties' insurance policy to resolve the summary judgment motion. Under Connecticut law, "an insurance policy is to be interpreted by the same general rules that govern the construction of any written contract." *Jemiola v. Hartford Cas. Ins. Co.*, 335 Conn. 117, 128, 229 A.3d 84, 91 (2019) (citation omitted). "If the terms of the policy are clear and unambiguous, then the language . . . must be accorded its natural and ordinary meaning." *Lexington Ins. Co. v. Lexington Healthcare Grp.*, 311 Conn. 29, 38, 84 A.3d 1167, 1173 (2014) (citation omitted).

---

[19] *Larson v. John Hancock Life Ins. Co.*, No. RG16 813803, 2017 WL 4284163, at *7 (Cal. Super. Mar. 23, 2017); *see also Lee v. Allstate Life Ins. Co.*, 361 Ill. App. 3d 970, 977, 838 N.E.2d 15, 22 (2005) ("[T]he voluntary payment doctrine does not apply in this case. . . [because] there is no claim to recover premiums paid to Allstate. [The p]laintiffs['] . . . damages are [instead] based upon diminution of policy cash value.")

In determining the ordinary meaning "of a word [in an insurance policy], it is appropriate to look to the dictionary definition of the term." *Lexington*, 311 Conn. at 42 n.8, 84 A.3d at 1175 n.8 (alteration in original) (citation and quotation omitted).  Further, when "interpreting [an insurance policy]," courts "must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." *Johnson v. Conn. Ins. Guar. Ass'n*, 302 Conn. 639, 643, 31 A.3d 1004, 1006–07 (2011) (citation omitted) (alteration in original).  Still, when the "insurance policy ... is 'reasonably susceptible to more than one reading,'" it "is ambiguous." *Conn. Ins. Guar. Ass'n v. Fontaine*, 278 Conn. 779, 786–87, 900 A.2d 18, 23 (2006) (citations omitted).  "[A]ny ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." *Jemiola*, 335 Conn. at 126, 229 A.3d at 129 (citation omitted).

### 1. *Obligation to Adjust*

First, the policy language does not obligate Genworth to affirmatively adjust COI rates as expectations of future mortality change.  All agree that the relevant policy provision reads:

> *Cost of Insurance Rate*.  The monthly rate is based on the insured's sex, attained age, policy duration and risk class.  The rates are determined by us according to expectations of future mortality.  We can change the rates from time to time, but they will never be more than the maximum rates shown in the *Table of Guaranteed Maximum Insurance Rates*.  A change in rates will apply to all persons of the same age, sex, and risk class and whose policies have been in effect for the same length of time.

(ECF No. 41-1, at 15.)

This "clear and unambiguous language" confers discretion and flexibility on Genworth's determination of COI rates. *Lexington*, 311 Conn. at 38, 84 A.3d at 1173.  Crucially, the contract provides that "We can change the rates from time to time." (ECF No. 41-1, at 15.)  The phrase "We can" alone confers permission onto Genworth.  "Can" ordinarily carries a permissive

27

meaning, not an obligatory one.    Indeed, one common dictionary defines "can" as "to have permission to—used interchangeably with may."    *Can*, Merriam-Webster (12th ed. 2025), https://www.merriam-webster.com/dictionary/can (last accessed July 15, 2026).[20]    Further, the policy's use of "We" supports a "discretion" reading of the policy.    "We" explains to whom the contract gives permission to change rates—Genworth.[21]    Taken together, the plain meanings of "We" and "can" indicate that Genworth has permission to "change rates from time to time." (ECF No. 41-1, at 15.)

Other phrases and provisions in the policy cut against an obligatory reading.    If the policy indeed obligates Genworth to reassess the "monthly rate" as expectations of future mortality change, "then that obligation would be monthly." *Protective*, 93 F.4th at 1332.    But the contractual language does not specify possible *monthly* changes, only occasional ones.    The phrase "from time to time" implies that the rates "can change" either in short intervals or long intervals. (ECF No. 41-1, at 15.) Accordingly, the phrase "from time to time" suggests that Genworth has no obligation to adjust the monthly rates.    In this way, the Court's reading "give[s] operative effect to every provision in order to reach a reasonable overall result." *Johnson*, 302 Conn. at 643, 31 A.3d at 1006–07

---

[20]    Other dictionaries define the word permissively. *Can*, Black's Law Dictionary (12th ed. 2024) (defining the word as "To be able to do something" or "To have permission"). The American Heritage Dictionary also explains that can is "[u]sed to indicate . . . ability"; "[u]sed to indicate possession of a specified power, right, or privilege"; and "[u]sed to indicate possibility or probability." *Can*, American Heritage Dictionary (5th ed. 2022).

[21] The United States Court of Appeals for the Eleventh Circuit relied, in part, on a similar rationale in examining a comparable policy. *See Advance Tr. & Life Escrow Servs., LTA v. Protective Life Ins. Co.*, 93 F.4th 1315, 1331 (2024). In that case, a policy gave the insurer "the capacity, ability, choice, or possibility to determine its internal COI rates" by using the phrase "Monthly cost of insurance rates will be determined *by us*, based on *our* expectations as to future mortality experiences." *Id.* at 1322, 1332 (emphasis added).

TVPX's three counterarguments change nothing. TVPX argues that such a reading renders superfluous the phrase "The rates are determined by us *according to* expectations of future mortality." (ECF No. 102, at 25 (emphasis added).) Because TVPX defines "according to" as "consistently with," the plaintiff believes that the policy obligates Genworth to change COI rates "consistently with" expectations of future mortality. (*Id.* at 21.) The discretionary reading, TVPX claims, means that the rates no longer change "consistently" future mortality expectations. (*Id.*) But the discretionary reading accounts for "according to." In light of the of the discretionary language in the policy, the phrase "according to" simply means that Genworth must change rates consistently with expectations of future mortality *when the insurer exercises its discretion to change rates at all.*[22]

Second, TVPX claims that the discretionary reading interprets the same language differently in separate provisions of the same contract. The policy at issue says that the monthly cost of insurance deduction "*is determined*" by a specific formula, and it also says that COI rates "*are determined* . . . according to expectations of future mortality." (ECF No. 41-1, at 15 (emphases added).) To TVPX, both instances of "determined" bind Genworth without discretion, and any interpretation otherwise contradicts itself. But the policy provides a reason for attaching different meanings to each instance: As explained above, the policy contains some discretionary language in explaining when Genworth can redetermine COI rates. By contrast, the policy provides no discretionary language when discussing the use of a monthly cost-of-insurance formula.

---

[22] To be clear, Genworth must also consider other factors when setting COI rates, including the "insured's sex, attained age, policy duration[,] and risk class." (ECF No. 41-1, at 16.)

29

Third and finally, TVPX claims that the discretionary reading leads to the "absurd" result of allowing Genworth to increase rates with "no corresponding commitment to decrease rates when [expectations of future mortality] improve." (ECF No. 102, at 27.) But this result does not reach the level of absurdity. The policy obligates Genworth neither to increase nor to decrease rates. Rather, the plain language grants Genworth discretion in determining *when* to change rates—and the contract simultaneously tempers that discretion by preventing Genworth from making whatever changes it desires to COI rates.

Under the terms of the policy, Genworth has no obligation to adjust rates as expectations of future mortality change.[23]

### 2. *Change in COI Rates*

Having determined that Genworth has no obligation to change rates, the Court now considers whether Genworth has indeed elected to change its rates. TVPX believes that "Genworth has, in fact, changed the COI rates . . . as insureds age." (ECF No. 102, at 32 (citation omitted).) After all, the policy contemplates that older policyholders will see higher deductions based on an increasing Table. Conversely, Genworth argues that it has not revised the rates themselves since 1995 but instead has mechanically applied the Table as insureds age. (ECF No. 108, at 21–22.)

---

[23] For the avoidance of doubt, the Court finds no ambiguity about Genworth's power to change rates. Courts may find ambiguity only when a term "is 'reasonably susceptible of more than one meaning.'" *Fontaine*, 278 Conn. at 786–87, 900 A.2d at 23. True, courts have found some COI rate provisions discretionary and others ambiguous. *Compare Protective*, 94 F.4th at 1330, *with Bella v. Wilton Reassurance Life of N.Y.*, 23-CV-1613, 2025 WL 1616851, at *6 (S.D.N.Y. June 5, 2025). But ambiguity does not arise "simply because courts have reached different conclusions." *Solers, Inc. v. Hartford Cas. Ins. Co.*, 146 F. Supp. 2d 785, 792–93 (E.D. Va. 2001) (citations omitted). TVPX has offered no persuasive argument to explain why the Court should twist the plainly discretionary language in this policy. Accordingly, the policy has just one meaning. And because the Court does not find the policy ambiguous, it need not consider any of extrinsic evidence in construing the contractual language. *Konover v. Kolakowski*, 186 Conn. App. 706, 720, 200 A.3d 1177, 1186 (2018) (allowing the use of extrinsic evidence "only if a contract is ambiguous").

Accordingly, Genworth interprets the contract to mean that a change in rates means a change to the underlying table.

"[L]ook[ing] at the contract as a whole," Genworth's interpretation again prevails. *Johnson*, 302 Conn. 639, 643, 31 A.3d 1004, 1006–07 (2011) (citation omitted). TVPX's argument subverts the policy structure by rendering the entire inclusion of a table superfluous. If a COI rate reassessment occurred every month, then the policy has little need to inform policyholders that rates "will never be more than the maximum rates shown in the [Table]" that contemplates years of maximum rates. (ECF No. 41-1, at 15.) But by incorporating the Table, the policy presupposes a stable rate structure. Accordingly, when policy's COI rates provision discusses a change in "the rates," it contemplates a reassessment of the *Table*.

TVPX agrees that Genworth has not updated the Table since 1995.[24] Accordingly, during the class period of 2013 onward, Genworth did not violate any duty to reassess COI rates in accord with expectations of future mortality.

### C. Application to the Class

This interpretation applies across the class. As explained above, all relevant states perform a two-step analysis in interpreting the contract, and the first step in each state is to uncover any ambiguity.[25] While some states admit different sorts of evidence to prove ambiguity, all relevant states agree that dictionaries and the four corners of the contract can explain a contract's meaning.[26] Here, the Court relied only on the contractual language and dictionary evidence. Accordingly, the

---

[24] (*See* ECF No. 20-1, at 3; ECF No. 102, at 32 ("[T]he *scale* has not changed recently.").)

[25] (*See* ECF Nos. 78-11, 78-12, 78-14.)

[26] (ECF No. 78-12; ECF No. 78-13.)

Court's interpretation of the uniform contractual language in the class's policies would prevail under any state's law.

For this reason, Genworth is entitled to summary judgment.

## V. CONCLUSION

For the reasons explained above, the Court will grant TVPX's motion for class certification. (ECF No. 78.) It will also deny in part Genworth's motion for summary judgment as it relates to standing and grant in part that motion as it relates to the merits of the breach claim. (ECF No. 84.) The Court will deny as moot all other pending motions. (ECF No. 112, 114, 121, 123, 125).

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 3 August 2026
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

32